1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

JAMES MCDONALD,

     Plaintiff,

  v.

ONEWEST BANK, FSB, *et al.*,

     Defendants.

No. C10-1952RSL

ORDER REGARDING CROSS-
MOTIONS FOR SUMMARY
JUDGMENT

   This matter comes before the Court on "Defendants OneWest, MERS, and

Northwest Trustee Services, Inc.'s Motion for Summary Judgment and to Dissolve Injunction"

(Dkt. # 172), "Plaintiff's Motion for Summary Judgment" (Dkt. # 176), and defendants' "Motion

to Supplement Record in Support of Defendants' Motion for Summary Judgment" (Dkt. # 204).

Having reviewed the memoranda, declarations, and exhibits submitted by the parties and having

heard the evidence and arguments presented on January 31, 2013, the Court grants the motion to

supplement the record and resolves the cross-motions for summary judgment as follows:

   Summary judgment is appropriate when, viewing the facts in the light most

favorable to the nonmoving party, there is no genuine dispute as to any material fact that would

preclude the entry of judgment as a matter of law. L.A. Printex Indus., Inc. v. Aeropostale, Inc.,

676 F.3d 841, 846 (9th Cir. 2012). The party seeking summary dismissal of the case "bears the

initial responsibility of informing the district court of the basis for its motion" (Celotex Corp. v.


EXHIBIT A

1    Catrett, 477 U.S. 317, 323 (1986)) and identifying those portions of the materials in the record

2    that show the absence of a genuine issue of material fact (Fed. R. Civ. P. 56(c)(1)). Once the

3    moving party has satisfied its burden, it is entitled to summary judgment if the non-moving party

4    fails to identify specific factual disputes that must be resolved at trial. Hexcel Corp. v. Ineos

5    Polymers, Inc., 681 F.3d 1055, 1059 (9th Cir. 2012). The mere existence of a scintilla of

6    evidence in support of the non-moving party's position will not preclude summary judgment,

7    however, unless a reasonable jury viewing the evidence in the light most favorable to the non-

8    moving party could return a verdict in its favor. U.S. v. Arango, 670 F.3d 988, 992 (9th Cir.

9    2012).

10                              **BACKGROUND**

11         In January 2007, plaintiff borrowed money from IndyMac Bank, F.S.B. The note

12    memorializing the mortgage identifies plaintiff as the borrower and IndyMac as the lender. Dkt.

13    # 1, Ex. B. A separate deed of trust was entered on the same date. Dkt. # 1, Ex. A. A deed of

14    trust is, in essence, a three-party mortgage through which the borrower gives a third party a lien

15    on the real property to hold in trust as security until the obligation to the lender is discharged.

16    Wash. House of Rep. Bill Report, 2008 Reg. Sess. S.B. 5378 (March 6, 2008). The third party is

17    called the trustee and the lender is generally identified as the beneficiary of the trust. Through

18    this arrangement, title to the real property passes to the borrower, but the lender is protected

19    under the trust agreement. If the borrower defaults on his loan, the beneficiary need not file a

20    civil suit to foreclose on the mortgage: pursuant to Washington's Deed of Trust Act ("DTA"),

21    RCW 61.24.005 et seq., the trustee may initiate nonjudicial foreclosure proceedings. As long as

22    the trustee complies with the DTA's procedural requirements, the lender can foreclose on the

23    property inexpensively and efficiently. If the borrower objects, the burden is on him to seek

24    judicial protection from wrongful foreclosure.

25         The deed of trust at issue in this case identifies four parties. Plaintiff is the

26

ORDER REGARDING CROSS-MOTIONS
FOR SUMMARY JUDGMENT        -2-

1   borrower. The lender is IndyMac. The trustee is Pacific Northwest Title Insurance Company.

2   Mortgage Electronic Registration Systems, Inc. ("MERS"), one of the defendants in this action,

3   is identified as the lender's nominee to act as the beneficiary.

4           On or about January 12, 2010, defendant Northwest Trustee Services, Inc.

5   ("NWTS"), acting as the agent of defendant OneWest Bank, FSB, sent plaintiff a notice of

6   default under the DTA. Although the notice identifies OneWest as the beneficiary of the deed of

7   trust and the servicer of the mortgage (Dkt. # 17, Ex. C), its actual interest in and relationship to

8   the loan at the time the notice was sent is unclear. OneWest maintains that it acquired the

9   servicing rights to plaintiff's loan on or about March 19, 2009, after IndyMac was closed by the

10  Office of Thrift Supervision and its assets were sold. There is no evidence that OneWest had

11  succeeded MERS and/or IndyMac as the beneficiary of the deed of trust as of January 12, 2010,

12  however.

13          Two weeks after the notice of default was issued, Brian Burnett, an employee of

14  OneWest, signed a document purporting to assign MERS' interests as beneficiary to OneWest.

15  Dkt. # 1, Ex. D. Although the signature block identifies Mr. Burnett as an "Assistant Vice

16  President" of MERS, there is no indication that he was employed by MERS in any capacity or

17  that he had signing authority for MERS on January 12, 2010.[1] Also on January 27, 2010,

18  OneWest appointed NWTS as successor trustee under the deed of trust (Dkt. # 1, Ex. F) and

19  provided to NWTS a declaration under penalty of perjury that OneWest "is the actual holder of

20  the promissory note . . . or has requisite authority under RCW 62A.3-301 to enforce said

21

22       [1] Defendants have produced a resolution authorizing Mr. Burnett to sign on behalf of MERS, but
23  it is dated after MERS purportedly assigned its interests as beneficiary to OneWest. At the evidentiary
    hearing, Charles Boyle, a Vice President for OneWest, testified that he believes Mr. Burnett had been
24  granted signing authority by MERS prior to January 12, 2010, based on (a) the fact that Mr. Burnett
    signed the assignment on behalf of MERS and (b) a prior resolution. Mr. Boyle was unable to produce
25  an earlier resolution, however, or explain why it has not been disclosed in this litigation.

26

ORDER REGARDING CROSS-MOTIONS
FOR SUMMARY JUDGMENT      -3-

obligation" (Defendants' Ex. A-15, Tab 18 (document produced in response to Request for Production #1).[2] The assignment of beneficial interest to OneWest and the appointment of NWTS as successor trustee were recorded in the King County Auditor's files on February 4, 2010.

On February 15, 2010, NWTS issued a notice of trustee's sale informing plaintiff that his house would be sold at auction on May 21, 2010. Dkt. # 12, Ex. 5. In April, plaintiff disputed the alleged mortgage debt and demanded that IndyMac and NWTS provide evidence that one of them or their assigns had possession of the original signed promissory note. Dkt. # 17, Ex. F. On May 18, 2010, OneWest informed plaintiff that Freddie Mac had purchased or invested in plaintiff's mortgage, but declined to provide most of the other information plaintiff had requested. OneWest particularly noted that "[o]riginal documents – or at least the original promissory note and deed of trust/mortgage – are not available for inspection although if you would like to obtain a certified copy please fill out the order form enclosed." Dkt. # 1, Ex. G.

In the beginning of October 2010, OneWest requested that Deutsche Bank National Trust Co., a document custodian, release the promissory note to OneWest. Decl. of Charles Boyle (Dkt. # 173) at ¶ 16. The custodian delivered the loan file and the enclosed note to OneWest on October 6, 2010. The document which defendants now contend is the original, signed promissory note was produced to the Court for viewing on January 31, 2013, and is currently stored at the office of counsel for defendants.[3] NWTS sent out a second notice of

---

[2] Defendant NWTS' motion to supplement the record to add the beneficiary declaration (Dkt. # 225) is DENIED as moot. The Court admitted into evidence all of the documents presented in Exhibit A-15 at the hearing held on January 31, 2013.

[3] In August 2010, defendants produced a different version of the note in plaintiff's bankruptcy case. In re James Bradley McDonald, B.R. No. 10-18496SJS (Dkt. # 19, Ex. A). As late as March 2011, defendants stated in their court filings in this action that Deutsche Bank retained possession of the original note and that OneWest's claim to possession was "currently through the Custodian." Dkt. # 49 at 8.

1  trustee's sale on or about November 1, 2010.

2         This action was filed on December 3, 2010, one week before the foreclosure sale

3  was scheduled to occur.  Based on the serious questions plaintiff raised regarding the merits of

4  his DTA claim and the balance of the hardships, the Court preliminarily enjoined the foreclosure

5  sale.  Plaintiff was required to make monthly payments of $2,347.56 into the registry of the

6  Court.  When plaintiff stopped making the required payments, he was given an opportunity to

7  bring the account up-to-date, but failed to do so.  The preliminary injunction was therefore lifted

8  on or about April 1, 2012.  Dkt. # 94.  The trustee did not, however, request that the Court set a

9  new sale date as provided in RCW 61.24.130(3).

10                          **DISCUSSION**

11  **A. Deed of Trust Act Claim, RCW 61.24.005 *et seq*.**

12         Plaintiff identifies a number of deficiencies in the assignments of interests,

13  appointments, and procedures used to initiate this nonjudicial foreclosure under the DTA.

14  Plaintiff seeks a declaration that defendants violated the DTA, a permanent injunction

15  precluding future foreclosure actions, and an award of damages.

16       **1. Validity of Past Foreclosure Efforts**

17         Whether defendants' past foreclosure efforts violated the DTA turns primarily on

18  whether OneWest and/or NWTS were authorized to issue the notice of default on January 12,

19  2010.  Pursuant to the DTA, the written notice of default must be provided by the beneficiary or

20  the trustee (RCW 61.24.030(8)), and only the beneficiary has the power to appoint a trustee or

21  successor trustee (RCW 61.24.010(2)).[4]  A "beneficiary" is defined as "the holder of the

22  instrument or document evidencing the obligations secured by the deed of trust."  RCW

23

24  _____

25      [4] In addition, the notice must identify both the owner and the servicer of the note.  RCW
   61.24.030(8)(l).  The notice of default in this case incorrectly identified OneWest as both the
   "Beneficiary (Note Owner)" and "Loan Servicer."  Dkt. # 17 at 40.

26

ORDER REGARDING CROSS-MOTIONS
FOR SUMMARY JUDGMENT        -5-

1   61.24.005(2).  OneWest has taken the position that, as a party to a May 12, 2009, custodial

2   agreement with Deutsche Bank, it had the right to request physical possession of the original

3   promissory note and was therefore "the holder" of the note when the notice of default was issued

4   on January 12, 2010.[5]  It is undisputed that OneWest did not obtain physical possession of the

5   note until October 2010 at the earliest.

6          OneWest relies on a South Carolina bankruptcy case in which the court found that

7   a trustee's constructive possession of the debtor's note through a document custodian satisfies

8   the definition of "holder." In re McFadden, 471 B.R. 136, 175 (D.S.C. 2012). The decision is

9   based on an interpretation of South Carolina law, however, and turns on the existence of an

10  agency relationship between the trustee and the document custodian. In this case, there is no

11  indication that Deutsche Bank was an agent of OneWest under Washington law. Although the

12  parties clearly had a contractual relationship through which they provided services to Freddie

13  Mac related to the storage and servicing of promissory notes (Dkt. # 68, Ex. 3), the contract does

14  not make Deutsche Bank OneWest's agent. As the Washington State Supreme Court recently

15  noted, "a prerequisite of an agency is control of the agent by the principal." Bain, 175 Wn.2d at

16  107.  If anyone had control over the parties to the Custodial Agreement, it was Freddie Mac. At

17  most, OneWest had a contractual right to obtain the original promissory note upon request. The

18  Court finds that neither OneWest nor any entity that could be called OneWest's agent under

19  Washington law possessed the note at the time the notice of default was issued in January 2010.

20          By enacting the DTA, the legislature provided lenders with an efficient and cost-

21  effective means by which to foreclose defaulted loans. The lenders must, however, strictly

22

23          [5] At the start of this litigation, OneWest took the position that it succeeded to MERS' role as
    beneficiary when OneWest took over the servicing rights from Freddie Mac. The Washington State
24  Supreme Court has since determined that, absent some indication that MERS actually possessed the
    promissory note secured by the deed of trust, it was never a lawful beneficiary under the DTA. Bain v.
25  Metropolitan Mortg. Group, Inc., 175 Wn.2d 83, 98-110 (2012). Thus, any succession argument based
    on the designation of MERS as beneficiary fails as a matter of law.
26

ORDER REGARDING CROSS-MOTIONS
FOR SUMMARY JUDGMENT                         -6-

1   comply with the procedural requirements of the act to ensure that homeowners are given a

2   meaningful opportunity to correct deficiencies and are protected from competing claims and

3   additional liabilities.[6]  Having found that OneWest was not the holder of the note when the

4   written notice of default was provided, it could not claim beneficiary status at the time.

5   OneWest was not, therefore, entitled to issue the notice of default under RCW 61.24.030(8).

6   Nor did OneWest have the power to clothe NWTS in the garb of trustee (RCW 61.24.010(2)),

7   making that entity's issuance of the notice, either as agent of OneWest or as the successor

8   trustee, defective under RCW 61.24.030(8).  In addition, plaintiff has established a violation of

9   RCW 61.24.030(8)(l) because the name and address of the owner of the note was not set forth in

10  the notice of default.[7]  Because there was a failure to comply with the nonjudicial foreclosure

11

12      [6]  The Court acknowledges the numerous decisions rejecting a borrower's demand that the lender
13  "show me the note."  See, e.g., Frase v. U.S. Bank, N.A., 2012 WL 1658400, at *5 (W.D. Wash. May
    11, 2012); Fay v. Mortg. Elec. Registration Sys., Inc., 2012 WL 993437, at *2 (W.D. Wash. Mar. 22,
14  2012); Gossen v. JPMorgan Chase Bank, 819 F. Supp.2d 1162, 1170 (W.D. Wash. 2011).  These
    decisions do not control here for two reasons.  First, the Washington State Supreme Court recently held
15  that actual physical possession of the original note, either directly or through an agent, is a prerequisite
    to a valid nonjudicial foreclosure under the DTA.  Bain, 175 Wn.2d at 101 and 106.  If a borrower has
16  taken the initiative to seek to enjoin a trustee's sale under RCW 61.24.130(1) and properly alleges that
    the purported beneficiary is not the "holder" for purposes of the DTA, the courts' pre-Bain reluctance to
17  require proof of actual possession must be reevaluated.  Second, plaintiff's DTA claim was based on
    more than speculation or a general indictment of the mortgage industry.  Plaintiff's timely and specific
18  request that OneWest confirm possession of the note was rebuffed prior to initiating this action.
    Plaintiff adequately alleged – based in part on his knowledge of the mortgage industry's document
19  handling and retention practices over the last decade – that an entity other than OneWest possessed the
20  note when the notice of default was issued.  Defendants' varying theories of authorization and
    possession in this litigation and the doubts plaintiff raised (and ultimately proved) regarding the location
21  of the note at issue here gave rise to a situation in which review of the actual note may be the only way
    to ensure that the DTA's procedural limitations are enforced.
22

23      [7]  Plaintiff has not, however, established a claim against NWTS under the DTA.  As trustee,
24  NWTS had few obligations under the statute:  it owed a duty of good faith to the participants (RCW
    61.24.010(4)) and had to confirm that the purported beneficiary was the owner of the note before issuing
25  the notice of trustee's sale (RCW 61.24.030(7)).  The declaration NWTS obtained from OneWest on
    January 27, 2010, satisfies the second requirement, and there is no evidence to support plaintiff's
26

1   procedures set forth in the statute, defendants are hereby enjoined from proceeding with any

2   foreclosure procedure based on the January 12, 2010, notice of default.[8]

3   **2. Validity of Future Foreclosure Efforts**

4           OneWest's authority to issue the statutory notice of default and/or to appoint a

5   successor trustee hinges on its actual physical possession of the original signed promissory note.

6   Bain, 175 Wn.2d at 89 (finding that "only the actual holder of the promissory note or other

7   instrument evidencing the obligation may be a beneficiary with the power to appoint a trustee to

8   proceed with a nonjudicial foreclosure on real property" under the DTA).  The note is, after all,

9   bearer paper.  Because there is a genuine issue of fact regarding whether OneWest now has

10  actual physical possession of the note, the Court cannot determine as a matter of law whether it

11  is entitled to initiate a second nonjudicial foreclosure proceeding under the DTA.[9]

12          Even if plaintiff is able to prove at trial that the note OneWest currently holds is

13  not the original, he will not be entitled to a permanent injunction precluding all future

14  foreclosure actions.  It is undisputed that plaintiff borrowed money to purchase his home and

15  that he has defaulted on the loan.  Plaintiff has not identified any legal or equitable justification

16  _____

17  conclusory allegations of bad faith.

18      [8] Defendants argue that an injunction is appropriate only if the borrower shows that the failure to
19  comply with the DTA procedures caused prejudice.  Dkt. # 172 at 13-14.  The cases they cite involve
    post-sale attempts to invalidate the foreclosure, not pre-sale requests for injunctive relief.

20      The fact that MERS was initially and improperly designated as the beneficiary of the deed of
21  trust does not affect the DTA analysis or automatically preclude nonjudicial foreclosures.  The issue
    under the DTA is whether defendants complied with its procedural requirements, primarily the actual
22  possession of the note at the time the notice of default was issued.  Who held the note before that point
23  in time or whether non-holders were improperly claiming beneficiary status does not alter the DTA
    analysis.

24      [9] The Court assumes, for purposes of this motion, that defendants will be able to rectify the
25  defects in assignments, appointments, and notices that plagued their initial attempt at a nonjudicial
    foreclosure.
26

1    for erasing the debt. Even if defendants are ultimately unable to utilize the expedited DTA

2    procedure in the future, they would be entitled to initiate a judicial foreclosure action and, if

3    applicable, to seek a deficiency judgment against plaintiff for any unrecovered amounts.

4    Donovick v. Seattle-First Nat. Bank, 111 Wn.2d 413, 420-21 (1988). Defendants are entitled to

5    summary judgment to the extent plaintiff seeks a permanent injunction against all future

6    foreclosure actions.

7        **3. Damages**

8            Plaintiff seeks $2,000 per statutory violation, $177,352.24 in lost income, and

9    $25,000 in punitive damages under the DTA and the Washington Consumer Protection Act

10    ("CPA"). Decl. of James McDonald (Dkt. # 184) at 10-11. The appropriateness of such an

11    award under the DTA is considered here.

12            Plaintiff has not identified, and the Court cannot find, any statutory or common

13    law authority that allows a private litigant to recover statutory or punitive damages for violations

14    of the DTA. Although RCW 61.24.127 allows the recovery of actual monetary damages in

15    certain circumstances, that provision applies where the borrower has failed to enjoin the trustee's

16    sale and seeks damages arising from the trustee's failure to comply with the requirements of the

17    DTA. The question before the Court is whether a claim for monetary damages exists in the

18    absence of a foreclosure sale.

19            Defendants identify a number of cases holding that the only pre-sale remedy

20    available to a borrower under the DTA is an injunction and barring any other cause of action

21    related to the wrongful initiation of a nonjudicial foreclosure. See, e.g., Pfau v. Wash. Mutual,

22    Inc., 2009 WL 484448, at *12 (E.D. Wash. Feb. 24, 2009); Krienke v. Chase Home Fin.. LLC,

23    140 Wn. App. 1032 (2007).[10] Although most of these cases were decided prior to the effective

25            [10] Despite the broad language of these cases, a borrower may be entitled to other forms of pre-

26    sale relief, such as an accounting or offset. See Olsen v. Pesarik, 118 Wn. App. 688 (2003).

ORDER REGARDING CROSS-MOTIONS
FOR SUMMARY JUDGMENT                            -9-

1   date of RCW 61.24.127, the same result was reached in <u>Vawter v. Quality Loan Serv. Corp. of</u>

2   <u>Wash.</u>, 707 F. Supp.2d 1115, 1123 (W.D. Wash. 2010).  The Washington Court of Appeals has

3   found the <u>Vawter</u> analysis persuasive and concluded that RCW 61.24.127 "contemplates that [an

4   action for monetary damages] would arise only after a foreclosure sale has occurred," citing

5   RCW 61.24.127(2)(a) and (2)(c).  <u>Grant v. First Horizon Home Loans</u>, 168 Wn. App. 1021,

6   2012 WL 1920931, at *5-6 and n.33 (May 29, 2012).  <u>See also Myers v. Mortg. Elec.</u>

7   <u>Registration Sys., Inc.</u>, 2012 WL 678148, at *2-3 (W.D. Wash. Feb. 24, 2012) (noting that

8   courts have refused to allow claims for damages under the DTA where plaintiff successfully

9   restrains a foreclosure sale, but that "the remedies change once a trustee completes a

10  foreclosure.").  The Court therefore finds that a claim for damages arising from violations of the

11  procedures set forth in the DTA does not arise unless and until a foreclosure sale occurs.  Until

12  that time, a borrower's only remedy under the DTA is to seek to enjoin the sale.[11]

13          **4. Discovery Disputes**

14          After reviewing the parties' written submissions regarding the pending motions for

15  summary judgment, the Court determined that oral argument and further explication of the

16  record were necessary to ensure the proper and just resolution of these motions.  A half day

17  evidentiary hearing was scheduled, the primary purpose of which was to inquire of Mr. Boyle

18  how he came to make so many factual misstatements in his declarations and to ensure that

19  plaintiff had access to all relevant and discoverable materials.  The Court specifically mentioned

20  that defendants had failed to produce electronic records regarding plaintiff's loan, promissory

21  note, and/or deed of trust.

22          In the meantime, defendants filed a motion to supplement the record, which was

23

24

25  [11]  Damages may, however, be available under another statute or cause of action, such as the
    Washington Consumer Protection Act or fraud.  <u>See</u> Bain, 175 Wn.2d at 115-20; <u>Myers</u>, 2012 WL
26  678148, at *2 n.3.

ORDER REGARDING CROSS-MOTIONS
FOR SUMMARY JUDGMENT                    -10-

1   noted on the Court's calendar for December 14, 2012, almost two months after the cross-motions

2   for summary judgment had been ready for consideration. Dkt. # 204. The evidence defendants

3   sought to submit – a declaration from a representative of Deutsche Bank regarding the chain of

4   custody of the original signed promissory note – was of obvious interest in this case. No

5   explanation for the late disclosure was provided. The Court took the motion to supplement

6   under advisement and requested that Mr. Corcoran be made available at the evidentiary hearing.

7          The testimony of Mr. Boyle and Mr. Corcoran confirmed what this Court has long

8   suspected: defendants have not taken their obligations as litigants in federal court seriously

9   enough. Rather than obtain declarations from individuals with personal knowledge of the facts

10  asserted or locate the source documents underlying its computer records, defendants chose to

11  offer up what can only be described as a "Rule 30(b)(6) declarant" who regurgitated information

12  provided by other sources. Rule 30(b)(6) is a rule that applies to depositions in which an

13  opposing party is given the opportunity to question a corporate entity and bind it for purposes of

14  the litigation. A declaration, on the other hand, is not offered as the testimony of the

15  corporation, but rather reflects – or is supposed to reflect – the personal knowledge of the

16  declarant.

17          Not surprisingly given the fact that his counsel apparently did not understand the

18  difference between a declaration based on personal knowledge and a Rule 30(b)(6) deposition,[12]

19  Mr. Boyle's declarations consist of sweeping statements, a few of which may be within his ken

20  and admissible, but most of which are assuredly hearsay. When he was asked to sign a

21  declaration in this case, he thought he was responding on behalf of OneWest and therefore felt

22  justified in questioning co-workers, running computer searches, and reviewing other sources

23  before reporting their statements as his own. Nothing in his declarations would alert the reader

24  

25          [12] At the evidentiary hearing, defense counsel asked Mr. Boyle what he understood his role was

26  when he signed declarations for OneWest as a 30(b)(6) witness.

ORDER REGARDING CROSS-MOTIONS
FOR SUMMARY JUDGMENT                    -11-

1   to the fact that Mr. Boyle was simply repeating what he had heard or read from undisclosed and

2   untested sources. When his statements turned out to be untrue, Mr. Boyle conveniently blames

3   inaccuracies in the underlying documentation, computer input errors, or faulty reporting. Had

4   defendants made the effort to produce admissible evidence in the first place, these errors may

5   have been uncovered and avoided before they could taint the discovery process in this case.

6          The Court is willing to assume that some of Mr. Boyle's untrue statements were

7   innocent errors arising from his reliance on out-of-court statements. Nevertheless, Mr. Boyle's

8   repeated assertions that OneWest has been the holder of the note through Deutsche Bank since

9   on or about March 19, 2009 (Dkt. # 49-3 at 3; Dkt. # 123 at 3; Dkt. # 173 at 3) is inexplicable.

10  Whether OneWest was the holder of the note, as that term is defined in the DTA, is one of the

11  primary issues in this litigation. In January 2011, the Court advised defendants that their

12  expansive definition of "holder" was inconsistent with the policy and practical considerations

13  that underlie bearer paper and the DTA. Rather than produce the original, signed note or provide

14  admissible evidence regarding its location in response, Mr. Boyle simply repeats, over and over

15  again, that OneWest is the holder based on a theory the Court had already called into question.

16  This tactic of parroting argument and business records (whether in declarations or in legal

17  memoranda) rather than providing actual evidence has been an issue since the inception of this

18  case. When plaintiff challenged OneWest's claim to be the holder of the note at the time the

19  notice of default was issued and otherwise disputed assignments and authorizations relied upon

20  in this case, defendants declined to do anything more than refer to their business practices or

21  confirm what their computerized records showed, without any attempt to investigate the alleged

22  irregularities. Defendants specifically declined to produce the original note for inspection,

23  sending this case into a holding pattern from which it has not yet recovered.

24         The Court is also disturbed by what appears to be a post hoc effort to imbue Mr.

25  Burnett with the power to act on behalf of MERS as of January 2010. Mr. Burnett signed an

26

ORDER REGARDING CROSS-MOTIONS
FOR SUMMARY JUDGMENT            -12-

1   Assignment of Deed of Trust on January 27, 2010, as an Assistant Vice President of MERS.

2   Decl. of Charles Chong (Dkt. # 183-2), Ex. 5.  In his original complaint, plaintiff alleged that

3   Mr. Burnett was not, in fact, an employee of MERS and provided evidence that Mr. Burnett was

4   actually an employee of OneWest.  Dkt. # 1 at 4.  In response, Mr. Boyle averred that Mr.

5   Burnett was an employee of OneWest with signing authority from MERS.  Dkt. # 49-3 at 4.[13]

6   Mr. Boyle offered a MERS corporate resolution in support of his statement, but, as plaintiff

7   quickly pointed out, the document is dated August 19, 2010.  Dkt. # 49 at 114.  For a period of

8   time, defendants avoided mention of Mr. Burnett, simply stating in their memoranda and Mr.

9   Boyle's declaration that "MERS" executed the Assignment of Deed of Trust on January 27,

10  2010, without mentioning the individual who actually signed the document.  Dkt. # 121 at 4;

11  Dkt. # 123 at 4; Dkt. # 172 at 4; Dkt. # 173 at 4.  At the evidentiary hearing, however, Mr. Boyle

12  testified that Mr. Burnett had signing authority for MERS on January 27, 2010, because (a) he

13  signed the assignment, (b) when Mr. Boyle had signing authority for MERS, it was pursuant to a

14  written authorization, and (c) Mr. Boyle believes he saw a prior resolution that authorized Mr.

15  Burnett to sign on behalf of MERS during the relevant time period.  The evidence submitted by

16  the parties does not support this last assertion:  a June 2009 corporate resolution identifies Mr.

17  Boyle, but not Mr. Burnett, as signing agents for MERS.  Decl. of Charles Chong (Dkt. # 183-2),

18  Ex. 6.  Mr. Boyle's testimony on this point, as on so many others, appears to be based on nothing

19  more than what he has been told by others and an unstated assumption that defendants' business

20  practices satisfy legal requirements.  Neither ground provides a firm footing for the facts to

21  which Mr. Boyle is all-too-willing to swear.

22          Finally, the disclosure of a computerized record that goes to a key issue in this

23  litigation (i.e., was the original signed promissory note in the loan file Deutsche Bank delivered

24

25          [13] Why Mr. Boyle rather than Mr. Burnett was asked to provide a statement under penalty of

26  perjury regarding Mr. Burnett's employment relationship and authorizations is unexplained and unclear.

ORDER REGARDING CROSS-MOTIONS
FOR SUMMARY JUDGMENT                    -13-

1   to OneWest in October 2010) for the first time at the evidentiary hearing held on January 31,

2   2013, is unacceptable.  Plaintiff has spent years attempting to track down the original note –

3   doubts regarding its location led to this lawsuit and feature prominently in the initial complaint,

4   every substantive filing, and the Court's orders.  The deficiencies in defendants' discovery

5   efforts are readily apparent from the fact that defendants did not bother to produce a declaration

6   or computer records from the document custodian until months after the motions for summary

7   judgment were fully briefed.  Even then, they failed to ascertain the meaning of the computer

8   records, resulting in testimony at the evidentiary hearing to the effect that the documents

9   produced thus far were insufficient to determine whether Deutsche Bank received the original

10  note with the loan file in January 2007.  In order to answer that question, Mr. Corcoran had to

11  look at another screen on his computer screen, which was finally provided to both the Court and

12  plaintiff via supplemental declaration on February 6, 2013.

13          The Court understands that discovery is burdensome and expensive and that

14  defendants did not ask to be dragged into this litigation.  Nevertheless, the discovery obligations

15  imposed by the Federal Rules of Civil Procedure are not optional:  defendants were required to

16  timely and fully respond to plaintiff's discovery requests.  Instead, defendants did less than the

17  bare minimum, presenting hearsay rather than admissible evidence, neglecting obvious sources

18  of information, forcing plaintiff, acting pro se, to file two motions to compel and seek an

19  extension of time to review late-disclosed information, presenting critical documents and

20  declarations long after discovery had closed and dispositive motions were pending, and

21  ultimately forcing another continuance of the trial date.  The fact that the late-disclosed

22  documents and declarations are essential to defendants' defense makes their inability and/or

23  unwillingness to conduct a meaningful investigation of plaintiff's claims even more striking.

24          The Court has at its disposal an array of rules and powers with which to respond to

25  the discovery failures outlined above.  Rule 37(b), for example, applies to defendants' untimely

26

ORDER REGARDING CROSS-MOTIONS
FOR SUMMARY JUDGMENT          -14-

1   productions after the Court had ordered disclosure.  Because discovery sanctions serve multiple

2   purposes, ranging from coercion and compensation to deterrence and punishment (see, e.g.,

3   Falstaff Brewing Corp. v. Miller Brewing Co., 702 F.2d 770, 784 n.10 (9th Cir. 1983)), the

4   Court is authorized to, among other things, designate facts as established, prohibit the offending

5   party from pursuing a defense, enter default judgment, and/or order the payment of reasonable

6   expenses.  Fed. R. Civ. P. 37(b)(2)(A).  "Rule 37 sanctions must be applied diligently both 'to

7   penalize those whose conduct may be deemed to warrant such a sanction, [and] to deter those

8   who might be tempted to such conduct in the absence of such a deterrent.'"  Roadway Express.

9   Inc. v. Piper, 447 U.S. 752, 763-64 (1980) (quoting National Hockey League v. Metropolitan

10  Hockey Club, 427 U.S. 639, 643 (1976)).

11          Section 1927 of Title 28 authorizes an award of costs, expenses and reasonable

12  attorney's fees associated with defendants' unreasonable and vexatious repetition of legal

13  theories and hearsay evidence regarding critical issues in this case.  Although the statute sets a

14  very high threshold before a party will be required to reimburse its opponent for a portion of its

15  expenses, plaintiff was forced to chip away layers of unsupported statements with virtually no

16  help from defendants (despite the fact that all relevant information was within their custody and

17  control), eventually obtaining key documents related to the location of his note only after the

18  Court scheduled an evidentiary hearing.  Defendants' overall discovery tactics – namely an

19  unjustified reliance on dubious business practices and hearsay – made it extremely difficult for

20  plaintiff to pursue his claims and unnecessarily complicated and multiplied these proceedings.

21  Defendants' initial discovery responses consisted of little more than the production of a few

22  easily accessible records with no attempt to locate source documents or persons with actual

23  knowledge of any of the relevant events, followed by a slow trickle of responsive documents

24  over the course of many months, culminating in key factual issues being addressed for the first

25  time at the evidentiary hearing.  This conduct has impeded plaintiff's efforts throughout this

26

ORDER REGARDING CROSS-MOTIONS
FOR SUMMARY JUDGMENT                    -15-

1   litigation, convincing him that he needed to associate counsel and significantly increasing the

2   costs of prosecuting this action.

3           The same conduct that gives rise to a violation of § 1927 is also sanctionable under

4   LCR 11(c): any party who "multiplies or obstructs the proceedings in a case may, in addition to

5   or in lieu of the sanctions and penalties provided elsewhere in these rules, be required by the

6   court to satisfy personally such excess costs and may be subject to such other sanctions as the

7   court may deem appropriate."

8           The Court finds that monetary sanctions in the amount of $25,000 will be awarded

9   under Fed. R. Civ. P. 37, 28 U.S.C. § 1927, and LCR 11(c) to offset the excess costs caused by

10   defendants' discovery violations, to punish unacceptable behavior, and as a deterrent to future

11   bad conduct. Defendants shall, within seven days of the date of this Order, pay $25,000 to

12   plaintiff through his attorney.

13 **B. Real Estate Settlement and Procedures Act ("RESPA"), 12 U.S.C. § 2605**

14           RESPA requires lenders and loan servicers to timely respond to Qualified Written

15   Requests ("QWRs") from borrowers. Within 60 days after receiving a QWR, the servicer must

16   provide the borrower with a written response that includes the information requested by the

17   borrower or an explanation of why the information is unavailable or cannot be obtained by the

18   servicer. 12 U.S.C. § 2605(e)(2)(C).[14] During that 60-day period, the servicer must refrain from

19   providing information regarding overdue loan payments to the consumer reporting agencies. 12

20   U.S.C. § 2605(e)(3).

21           On April 27, 2010, plaintiff sent a written request for information to IndyMac and

22   NWTS. Dkt. # 68, Ex. 10. Plaintiff specifically identified the request as a "Qualified Written

23   Request" under RESPA, indicated that he was attempting to ensure that he had not been or was

24

25      [14] The Dodd Frank Act, Pub. L. 111-203, Title XIV, § 1400(c) and § 1463(b) (July 21, 2010),

26   shortened the time periods in which the lender had to respond from 60 days to 30 days.

ORDER REGARDING CROSS-MOTIONS
FOR SUMMARY JUDGMENT           -16-

1   not then the victim of a fraud, and demanded "absolute first-hand evidence from you and/or your

2   legal department with regard to the original signed promissory note," as well as a chain of

3   custody for the note. Id., at 2.  Plaintiff reminded defendants of their obligations under

4   § 2605(e)(3) and requested that they conduct their own *de novo* investigation to assure

5   themselves of the existence and accuracy of the claimed indebtedness. Id.  Plaintiff specifically

6   requested 186 different documents or categories of documents related to his loan.  The first

7   twenty requests seek specific documents related to the holding, servicing, and beneficial interest

8   in the note, including an express request for "a certified copy of the signed promissory note

9   showing the front and back of the document." Id., at 4-5.  Another 33 requests seek similar

10  information, but are written more broadly to capture all transfer and interest data including the

11  physical location of the original promissory note.  Plaintiff also requests data contained in

12  defendants' computerized records (4 requests), documents related to payments and charges to his

13  account (44 requests[15]), correspondence regarding the loans (4 requests), documents generated

14  pre-closing (1 request), information regarding the treatment of and justifications for late fees (7

15  requests), information regarding inspections and appraisals of plaintiff's property (44 requests),

16  information regarding insurance policies on the property (21 requests), and the identity of

17  persons or entities who approved the foreclosure of the property (2 requests).  Although the

18  sheer number of requests is daunting, very few of the requests are nonsensical, a fair number of

19  them are directly relevant to the issues with which RESPA is concerned, and most of the others

20  would require virtually no effort on defendants' part to answer.  For example, a negative answer

21  to a preliminary inquiry, such as "have any property inspections been conducted on my land

22  since the inception of this account," would negate the need to respond to all of the subsequent

23  questions in that section.

24  _____

25   [15] Four of these requests ask defendants to identify the contractual provision that authorizes the

26  imposition of particular assessments or charges.

On May 18, 2010, OneWest responded. Dkt. # 68, Ex. 11. OneWest provided very little information, however, other than an uncertified copy of the promissory note, a 24-month payment history for the account, the most recent escrow analysis, a form through which plaintiff could again request (and pay for) additional documents, and a statement that Freddie Mac was "the investor" on plaintiff's loan. OneWest took the position that plaintiff's request was not a QWR because it did not identify an error in the servicing of his account. It therefore declined to stop reporting the default to the credit reporting agencies and provided responses only as a customer service. Defendants seek summary judgment on plaintiff's RESPA claims as to all defendants on the ground that plaintiff's April 27, 2010, communication was not a QWR. Defendants also argue that RESPA is not applicable to MERS or NWTS.

**1. Qualified Written Request**

For purposes of RESPA, a QWR is "a written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, that --

(i) includes, or otherwise enables the servicer to identify, the name and account of the borrower; and

(ii) includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error *or* provides sufficient detail to the servicer regarding other information sought by the borrower."

12 U.S.C. § 2605(e)(1)(B) (emphasis added). Although there is no indication that plaintiff was aware of a particular error in his account, he clearly identified documents and categories of documents (*i.e.*, "other information" in the parlance of § 2605(e)(1)(B)) that he sought from the servicer. Courts in this district disagree on whether a request for documents or information regarding the servicing of a loan constitutes a QWR in the absence of a claim of error. See Eifling v. Nat'l City Mortg., 2011 WL 893233, at *2-3 (W.D. Wash. Mar. 15, 2011) (a defaulted borrower's written inquiry regarding late fees and charges coupled with a request for 22

1  categories of documents is not the type of request RESPA was designed to cover); Moon v.

2  GMA Mortg. Corp., 2009 WL 3185596 at *4 (W.D. Wash. Oct. 2, 2009) (a widow's written

3  request for copies of "all the loan documents" is a QWR).

4         The Eifling court was concerned that borrowers who had defaulted on their loans

5  could "flood their lender with documentation requests, on the hope that a failure to timely

6  comply will lead to an affirmative cause of action, or a defense to a collection or foreclosure

7  action." Eifling, 2011 WL 892322, at *3. RESPA has built-in procedures and requirements that

8  will, for the most part, forestall the feared flood. A request for documents must be specific and it

9  must relate to the servicing of the loan.[16] Assuming a proper request is made, the lender's failure

10  to appropriately respond does not provide a defense against foreclosure, but merely gives rise to

11  a claim for actual damages (unless the violations amount to a pattern and practice, in which case

12  statutory damages may be available). The upside of filing unnecessary QWRs is therefore rather

13  limited. RESPA was enacted in large part because lenders and servicers were not responding to

14  legitimate inquiries from their borrowers. The legislature specifically determined what was and

15  was not a "qualified written request" that would trigger the lender's duty to respond. If the

16  requirements established by Congress are met, the lender has a statutory duty to act: the Court

17  will not second-guess the wisdom of the legislature's policy choice.

18         In this case, plaintiff's requests were not made on a payment coupon or other

19  payment medium supplied by the lender or servicer. The April 27, 2010, communication

20  provides plaintiff's name and loan number and specifically describes the documents and

21  information requested. Having reviewed the communication, it is clear that a significant number

22  of the requests relate to the servicing of plaintiff's loan. Because 12 U.S.C. § 2605(e)(1)(B)(ii)

23

24      [16] "Servicing" is defined in the statute as "receiving any scheduled periodic payment from a

  borrower pursuant to the terms of any loan . . . and making the payments of principal and interest and

25  such other payments with respect to the amounts received from the borrower as may be required

  pursuant to the terms of the loan." 12 U.S.C. § 2605(i)(3).

26

ORDER REGARDING CROSS-MOTIONS
FOR SUMMARY JUDGMENT     -19-

1   is written in the disjunctive, the Court finds that neither the language of the statute nor

2   Congressional intent required plaintiff to allege an accounting error in order to obtain

3   information from the servicer.  Plaintiff provided sufficient detail to the servicer regarding the

4   "other information" he sought, thereby satisfying the final requirement of QWRs for purposes of

5   RESPA.  While OneWest may have been justified in ignoring requests for information that were

6   unrelated to the servicing of plaintiff's loan, its refusal to respond to the vast majority of

7   plaintiff's inquiries violated 12 U.S.C. § 2605(e)(2) and its refusal to refrain from reporting

8   overdue payments to the credit reporting agencies upon receipt of the QWR violated 12 U.S.C.

9   § 2605(e)(3).

10      **2. Applicability of RESPA § 2605(e)**

11          The obligations imposed by § 2605(e) apply only to the "loan servicer."  Plaintiff's

12  RESPA claims against MERS and NWTS therefore fail as a matter of law.

13      **3. Damages**

14          In a case brought by an individual, a failure to comply with the requirements of

15  RESPA makes the servicer liable for "an amount equal to the sum of --

16          (A)  any actual damages to the borrower as a result of the failure; and

17          (B)  any additional damages, as the court may allow, in the case of a pattern or practice of

18          noncompliance with the requirements of this section, in an amount not to exceed $1,000."

19  12 U.S.C. § 2605(f)(1).  Plaintiff argues that he is entitled to actual damages associated with

20  OneWest's failure to respond to his QWR and statutory damages of $2,000 per violation (of

21  which he counts six) related to the continued reporting to the three credit reporting agencies.

22  Plaintiff has not, however, identified any actual damages suffered as a result of OneWest's

23  failure to respond adequately to the QWR.  The lack of information did not cause plaintiff to

24  send his payments to the wrong entity, for example, or result in the accrual of late fees or

25  penalties that could have been avoided had defendants timely responded:  plaintiff was already

26

ORDER REGARDING CROSS-MOTIONS
FOR SUMMARY JUDGMENT            -20-

1  in default when the QWR was sent.  Nor has plaintiff shown a pattern or practice of violating

2  § 2605(e)(3).  The evidence reveals only a single wrong: the failure to treat plaintiff's letter as a

3  QWR.  A pattern and practice of wrongdoing will not be inferred simply because that one

4  determination resulted in improper reporting to the credit reporting agencies.  Plaintiff is not

5  entitled to summary judgment on his RESPA claim.

6  **C.  Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq.***

7         As discussed more fully in the order granting plaintiff leave to amend his

8  complaint (Dkt. # 100 at 7-9), OneWest and/or NWTS may be debt collectors subject § 1692f(6)

9  of the FDCPA if they use "any instrumentality of interstate commerce or the mails in any

10  business the principal purpose of which is the enforcement of security interests."  15 U.S.C.

11  § 1692a(6).  The statute specifically excludes from the definition of debt collector "any person

12  collecting or attempting to collect any debt owned or due or asserted to be owed or due another

13  to the extent such activity . . . concerns a debt which was not in default at the time it was

14  obtained by such person."  15 U.S.C. § 1692a(6)(F).  Assuming for purposes of this motion that

15  OneWest's principal business is the enforcement of security interests, exclusion F applies to

16  OneWest because it obtained the servicing rights to plaintiff's loan long before he defaulted.

17  See De Dios v. Int'l Realty & Investments, 641 F.3d 1071, 1074 (9th Cir. 2011).  OneWest is

18  not, therefore, a debt collector subject to the FDCPA.

19         Pursuant to § 1692f of the FDCPA, a debt collector such as NWTS is precluded

20  from "[t]aking or threatening to take any nonjudicial action to effect dispossession or

21  disablement of property if – (A) there is no present right to possession of the property claimed as

22  collateral through an enforceable security interest . . . ."  NWTS argues that it did not take any

23  nonjudicial action to effect dispossession of property because plaintiff would remain in physical

24  possession of the real estate until the trustee sale occurred, title passed, and plaintiff voluntarily

25  relinquished possession or an unlawful detainer action forced his eviction.  Defendant ignores

26

ORDER REGARDING CROSS-MOTIONS
FOR SUMMARY JUDGMENT              -21-

1   the purpose of the statute and focuses its argument on the wrong property. The FDCPA was

2   enacted to protect consumers from abusive debt collection practices, not simply to provide a

3   cause of action after funds or collateral were improperly taken. Under defendants' theory, all

4   nonjudicial foreclosures would fall outside the reach of the FDCPA, regardless of any abusive

5   practices used during the process, because the homeowner is not actually forced from his home

6   until the foreclosure is completed. Given the language of the statute – which specifically covers

7   merely threatening to take nonjudicial action – such an outcome is nonsensical. A nonjudicial

8   foreclosure intended to dispossess the homeowner of title and ownership of real property is the

9   type of debt collection activity that may be subject to § 1692f(A).

10        NWTS took nonjudicial action to dispossess plaintiff of the title to his property

11   when it began the foreclosure process by issuing the notice of default. At the time, NWTS had

12   not been appointed successor trustee and was not acting on behalf of the entity that had actual

13   physical possession of the note: it therefore lacked the right to effect dispossession of plaintiff's

14   property. Plaintiff has established that NWTS violated § 1692f(6)(A) of the FDCPA.

15        Pursuant to 15 U.S.C. § 1692k, plaintiff may be entitled to actual damages and

16   "additional damages as the court may allow, but not exceeding $1,000." Plaintiff will be given

17   an opportunity to prove actual damages flowing from NWTS' violation of § 1692f(6)(A) at trial.

18   **D. Washington Consumer Protection Act**

19        The Washington Consumer Protection Act ("CPA") prohibits "[u]nfair methods of

20   competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

21   RCW 19.86.020. A private cause of action exists under the CPA if (1) the conduct is unfair or

22   deceptive, (2) occurs in trade or commerce, (3) affects the public interest, and (4) causes injury

23   (5) to plaintiff's business or property. Hangman Ridge Training Stables, Inc. v. Safeco Title Ins.

24   Co., 105 Wn.2d 778, 780 (1986). The purpose of the CPA is to protect consumers from harmful

25   practices, which is why plaintiff must allege an actual or potential impact on the general public,

26

ORDER REGARDING CROSS-MOTIONS
FOR SUMMARY JUDGMENT          -22-

1   not merely a private wrong. <u>Lightfoot v. Macdonald</u>, 86 Wn.2d 331, 333 (1976). Defendants

2   argue that plaintiff cannot establish most of the elements of a CPA claim.

3          The CPA does not define "unfair or deceptive" for purposes of the first element.

4   Whether an act is unfair or deceptive is a question of law. <u>Leingang v. Pierce County Med.</u>

5   <u>Bureau, Inc.</u>, 131 Wn.2d 133, 150 (1997). Washington courts have held that a deceptive act

6   must have the capacity to deceive a substantial portion of the population (<u>Sing v. John L. Scott,</u>

7   <u>Inc.</u>, 134 Wn.2d 24, 30 (1997)) and "misleads or misrepresents something of material

8   importance" (<u>Holiday Resort Cmty. Ass'n v. Echo Lake Assocs.</u>, LLC, 134 Wn. App. 210, 226

9   (2006)). This element is distinct from the third element of public interest impact and focuses on

10  the act's capacity to deceive rather than its actual impact on the public. <u>May v. Honeywell Int'l,</u>

11  <u>Inc.</u>, 331 Fed. Appx. 526, 529 (9th Cir. 2009). <u>See also</u> <u>Henery v. Robinson</u>, 67 Wn. App. 277,

12  291 (1992).

13          In <u>Bain v. Metropolitan Mortg. Group, Inc.</u>, 175 Wn.2d 83, 117 (2012), the

14  Washington State Supreme Court found that characterizing a non-holder (in that case, MERS) as

15  the beneficiary in the deed of trust when it knew or should have known that it must have actual

16  possession of the note to be the beneficiary under Washington law has the capacity to deceive

17  for purposes of a CPA claim. The same misrepresentation was made by MERS and OneWest in

18  this case, followed by a number of misrepresentations by NWTS in the notice of default. The

19  Supreme Court also found that the third element, public interest, was presumptively met because

20  MERS "is involved with an enormous number of mortgages in the country (and our state),

21  perhaps as many as half nationwide." <u>Bain</u>, 175 Wn.2d at 118. All three named defendants

22  play substantial roles in the mortgage industry in this state, and the business practices that gave

23  rise to this litigation – particularly the misleading designation of first MERS and then OneWest

24  as beneficiaries and the issuance of notices of default without proper assignments and/or

25  possession of the original note – are in no way unique to plaintiff but rather affect the general

26

ORDER REGARDING CROSS-MOTIONS
FOR SUMMARY JUDGMENT            -23-

1    borrowing public. The third element is, therefore, satisfied.

2       The issue, then, is whether plaintiff can show injury caused by defendants'

3    deceptive acts. "Personal injuries, as opposed to injuries to 'business or property,' are not

4    compensable and do not satisfy the injury requirement." Panag v. Farmers Ins. Co. of Wash.,

5    166 Wn.2d 27, 57 (2009). Plaintiff may not, therefore, recover for any emotional distress

6    caused by defendants' deceptive acts. With regard to any claimed damages, "plaintiff must

7    establish that, but for the defendant's unfair or deceptive practice, the plaintiff would not have

8    suffered an injury." Indoor/Billboard/Wash.. Inc. v. Integra Telecom of Wash.. Inc., 162 Wn.2d

9    59, 84 (2007). Plaintiff alleges, with ample support in the record, that defendants' deceptive

10   acts forced him to expend time and money attempting to determine who actually holds his note,

11   both prior to and during this litigation. While the costs of instituting a CPA action to challenge

12   defendants' conduct do not, in and of themselves, constitute cognizable injury (Demopolis v.

13   Galvin, 57 Wn. App. 47, 54 (1990)), investigation expenses and other costs associated with

14   dispelling the uncertainty created by defendants' deceptive conduct sufficiently establish injury

15   under the CPA (Panag, 166 Wn.2d at 62-63).

16      Plaintiff has not, however, established the amount of damages recoverable under

17   the CPA. Plaintiff claims "$2000 per violation," but offers no authority or factual support for

18   that proposition. RCW 19.86.090 authorizes the recovery of "actual damages sustained by him .

19   . . together with the costs of suit, including a reasonable attorney's fee. In addition, the court

20   may, in its discretion, increase the award of damages up to an amount not to exceed three times

21   the actual damages sustained" or $25,000, whichever is less. Plaintiff has submitted some

22   information regarding the costs of suit, but other damages that may be recoverable under the

23   CPA have not established.

24   **E. Fraud**

25      In order to state a cause of action for fraud, plaintiff must show that he was

26

ORDER REGARDING CROSS-MOTIONS
FOR SUMMARY JUDGMENT  -24-

1   unaware of the falsity of defendants' statements and justifiably relied on the truth of the

2   representations. Baddeley v. Seek, 138 Wn. App. 333, 338-39 (2007).  He cannot do so.  Even

3   assuming that defendants lied regarding material facts with the intent of having others rely upon

4   the representations so as to effectuate the foreclosure of plaintiff's loan, plaintiff himself was not

5   fooled.  Far from relying on defendants' representations that they were the beneficiary, owner,

6   holder, and/or assignee, plaintiff challenged their assertions and ultimately proved that these

7   statements were intentional misrepresentations.  A fraud claim will not lie in these

8   circumstances.

9   **F.  Fraud on the Court**

10          Fraud on the court occurs when intentional misstatements regarding material issues

11   are made in a court proceeding and harm the integrity of the judicial process. Dixon v. Comm'r

12   of Internal Revenue, 316 F.3d 1041, 1046 (9th Cir. 2003).  While defendants have undoubtedly

13   put before the Court misstatements of fact, they have been considered in other contexts.  The

14   false statements in the underlying foreclosure process gave rise to plaintiff's DTA and CPA

15   claims, which have been considered on the merits.  Mr. Boyle's misstatements and defendants'

16   other discovery failures during this litigation have been addressed in Section A.4. of this Order.

17   The Court finds that, while sanctionable, defendants' conduct does not amount to fraud

18   perpetrated by officers of the court that prevents the judicial machinery from performing its

19   impartial task of resolving cases that are presented for adjudication. U.S. v. Chapman, 642 F.3d

20   1236, 1241 (9th Cir. 2011).[17]

21   **G.  Civil Conspiracy**

22          Plaintiff has not responded to defendants' request for summary judgment on his

23   civil conspiracy claim.  Although there is fairly good evidence that participants in the mortgage

24

25       [17]  Plaintiff has not alleged a public fraud or criminal profiteering claim in his Second Amended

26   Complaint.  He cannot add a new cause of action through a dispositive motion.

1   industry entered into an affirmative agreement to save costs by creating MERS to short-cut the

2   traditional property records systems maintained by the states (see Bain, 175 Wn.2d at 94-98),

3   plaintiff has not shown that the means utilized were unlawful or that the private recordation

4   process caused him any harm.  To the extent the parties failed to make timely and effective

5   assignments, appointments, and/or transfers of the note to accomplish a nonjudicial foreclosure

6   under the DTA, there is no indication that these failures were the result of a conspiracy rather

7   than simply sloppy business practices.

8   **H.  Slander of Title**

9          Plaintiff has not responded to defendants' request for summary judgment on his

10  slander of title claim.  While defendants' assumption that they could initiate a nonjudicial

11  foreclosure action as long as they had the right to obtain the original note was incorrect, plaintiff

12  has not shown that, at the time the notice of default and notice of trustee sale were published,

13  defendants acted with malice.

14  **I.  Fair Credit Reporting Act ("FCRA")**

15         The Court has considered OneWest's motion for summary judgment on plaintiff's

16  FCRA claim in an accompanying order.  Because there are issues of fact regarding the

17  reasonableness of defendants' investigation, plaintiff's request for summary judgment on the

18  § 1681s-2(b)(1) claim is DENIED.

19                          **CONCLUSION**

20         For all of the foregoing reasons, defendants' motion for summary judgment (Dkt.

21  # 172) and plaintiff's cross motion (Dkt. # 176) are GRANTED in part and DENIED in part.

22  Defendants are hereby enjoined from proceeding with any foreclosure procedure based on the

23  January 12, 2010, notice of default.  Plaintiff's claim for damages related to the DTA violations

24  is DISMISSED, however, and his request for a permanent injunction against all future

25  foreclosure efforts is DENIED.  The jury will be asked to determine whether defendants now

26

ORDER REGARDING CROSS-MOTIONS
FOR SUMMARY JUDGMENT                    -26-

1   possess the original, signed promissory note, in which case they may be able to initiate a new

2   nonjudicial foreclosure under the DTA.

3         Plaintiff's RESPA claims against MERS and NWTS are DISMISSED.  Plaintiff's

4   fraud, fraud-on-the-court, civil conspiracy claims, and slander of title claims are DISMISSED.

5   Plaintiff may, however, proceed to trial on damages related to his FDCPA claim against NWTS,

6   his RESPA claim against OneWest, and his CPA claim against all defendants.  Plaintiff may also

7   pursue his claim under 15 U.S.C. § 1681s-2(b)(1) of the FCRA.

8         Defendants' motion to supplement the record (Dkt. # 204) is GRANTED.

9   Defendant NWTS' motion to supplement the record (Dkt. # 225) is DENIED as moot.

10  Defendants shall, within seven days of the date of this Order, pay $25,000 to plaintiff through

11  his attorney.

13        Dated this 7th day of March, 2013.

15        Robert S. Lasnik
16        United States District Judge

ORDER REGARDING CROSS-MOTIONS
FOR SUMMARY JUDGMENT       -27-